**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES, | |
| Plaintiff, | Case No. 1:19-CV-1877 |
| v. | Judge John Robert Blakey |
| ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services, | |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Illinois Department of Healthcare and Family Services (Illinois or DFS) brings this action against the United States Department of Health and Human Services (HHS). In 2016, the HHS' Departmental Appeals Board affirmed a decision by HHS' Centers for Medicare and Medicaid Services disallowing $140 million in federal reimbursements for Medicaid payments by Illinois to Illinois hospitals. Illinois then filed suit in this Court, seeking review of the Board's decision under the Administrative Procedure Act (APA). The parties now cross-move for summary judgment. [17]; [18]. For the reasons explained below, this Court grants Illinois' motion and denies HHS' motion.

## I.   Background

### A.   Medicaid

#### 1.   Medicaid Overview

Medicaid constitutes a cooperative federal-state program pursuant to which the federal government provides financial assistance to participating States who provide healthcare to Medicaid-eligible populations—typically lower-income individuals and families. [13] at ¶¶ 19–20; *Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606, 610 (2012). In exchange for federal funding, States participating in Medicaid must implement and operate Medicaid programs in compliance with federally-mandated standards. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015). The Centers for Medicaid and Medicare Services (CMS)—a division of HHS—ultimately maintains responsibility for overseeing state compliance with federal Medicaid requirements. *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).

To qualify for Medicaid funding, each participating State must enter into a "State Plan" approved by CMS detailing the nature and scope of the State's Medicaid program. *Douglas*, 565 U.S. at 610; *Armstrong*, 575 U.S. at 323. CMS reviews each State's Plan and any later amendments to ensure they comply with statutory and regulatory requirements governing Medicaid. *Douglas*, 565 U.S. at 610. Once CMS approves a State Plan, the State becomes eligible to receive federal matching funds for a statutorily-set percentage of the amount "expended . . . as medical assistance under the State plan." *See* 42 U.S.C. § 1396b(a)(1). Medicaid providers, such as

hospitals, receive Medicaid payments directly from the States, and the federal government reimburses States in turn. *See generally* 42 U.S.C. § 1396b.

The federal government generally pays between 50 and 83 percent of the costs the State incurs for patient care, *Ahlborn*, 547 U.S. at 275, and its share of a State's expenditures is known as the "Federal Financial Participation" or "FFP," [13] at ¶ 21; *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 543 (7th Cir. 2012). Each State Plan sets forth the terms of the FFP. [13] at ¶¶ 21–22.

States possess wide latitude in setting Medicaid reimbursement rates for hospitals. *Id.* at ¶ 28; *see also Smith v. Miller*, 665 F.2d 172, 178 (7th Cir. 1981); *Alaska Dep't of Health & Soc. Servs. v. Centers for Medicare & Medicaid Servs.*, 424 F.3d 931, 935 (9th Cir. 2005) ("Assuming that its plan meets federal requirements, a state has considerable discretion in administering its Medicaid program, including setting reimbursement rates."). In general, States calculate and make Medicaid payments to hospitals under one of two methods: a "prospective" method, or a "retrospective" method. [13] at ¶ 8. Under a retrospective method, a state makes estimated interim payments to hospitals, but then "settles up"—or reconciles—the final payment amount after reviewing the hospital's actual costs. *Id.*

In contrast, under a prospective method, "the amount of payment per discharge is fixed in advance, is not based on a hospital's actual costs, and is not subject to retroactive adjustment." *Washington Hosp. Ctr. v. Bowen*, 795 F.2d 139, 142 n.2 (D.C. Cir. 1986); [13] at ¶ 8. A State pays for compensable services during the relevant period using rates based upon information from an earlier period. [13] at ¶ 8. States

may favor the prospective method because it sets "in advance a payment rate for treating a specific patient," and consequently "induces the hospital to seek the most economical means of treatment." Gerard F. Anderson, Ph.D. & Mark A. Hall, J.D., *The Adequacy of Hospital Reimbursement Under Medicaid's Boren Amendment*, 13 J. Legal Med. 205, 206 (1992).

### 2.     The OIG

The Inspector General of HHS maintains authority to audit State Medicaid operations to determine whether funds "are being properly expended for the purposes for which they were appropriated under Federal and State law and regulations," and to issue a report. 42 C.F.R. §§ 430.33(a)(2), (b)(2). If the report determines "that a claim or portion of claim" by the State for FFP "is not allowable," CMS may send the State a "disallowance letter" explaining why Medicaid funding is unavailable for its claims. *Id.* § 430.42(a).

### 3.     DSH Payments

Under the Social Security Act, disproportionate share hospitals (DSH), which serve a disproportionate share of Medicaid-eligible and low-income patients, receive additional payments known as "DSH payments." 42 U.S.C. §§ 1396a(a)(13)(A)(iv), 1396r-4(b), 1396r-4(c); [13] at ¶ 24. The Act establishes an annual DSH allotment for each State, limiting FFP for total statewide DSH payments made to hospitals. 42 U.S.C. §§ 1396r-4(f)(3); [13] at ¶ 26. In 1993, Congress added subsection (g) to § 1923 of the Act, 42 U.S.C. § 1396r-4, which further limits the DSH payments that an individual hospital may receive to its "shortfall"—the hospital's costs of providing

services to Medicaid and uninsured patients, less the payments it received from (or for) those patients. [13] at ¶¶ 4, 27.

**B.    Factual Background**

**1.    The Illinois State Plan**

This case concerns HHS' interpretation of the provision of Illinois' State Plan governing limits on DSH payments (DSH provision), and specifically, whether the provision allows a prospective or retrospective method, or either. [13] at 3. Throughout the relevant period, the DSH provision has stated:

> [1] In accordance with Public Law 103–66, adjustments to individual hospital's disproportionate share payments shall be made if the sum of Medicaid payments (inpatient, outpatient, and disproportionate share) made to a hospital exceed the costs of providing services to Medicaid clients and persons without insurance.
>
> [2] The adjustment to hospitals will be computed by determining a hospital[']s cost of inpatient and outpatient services furnished to Medicaid patients, less the amount paid to the hospital for inpatient and outpatient services excluding DSH payments made under this State Plan.
>
> [3] The cost of services provided to patients who have no health insurance or source of third-party payment less any payments made by these patients shall be determined and added to the Medicaid shortfall calculated above.
>
> [4] The result shall be compared to the hospitals estimated DSH payments.
>
> [5] If the estimated DSH payments exceed the DSH limit (Medicaid shortfall plus cost of uninsured) then the Department will reduce the hospitals' DSH rate per day so that their DSH payments will equal the DSH limit.
>
> [6] If necessary, retroactive adjustments will be made.

5

[12-5] at 20.

## 2. OIG Reports

During fiscal years 1997 through 2000, Illinois made approximately $338 million in DSH payments to UIC Hospital and approximately $39.8 million in DSH payments to Mt. Sinai Hospital. [13] at ¶ 34. Both hospitals are located in Chicago, and both serve a high percentage of low-income and uninsured individuals. *Id.* at ¶ 25.

In 2004, HHS' Office of Inspector General (OIG) conducted audits of Illinois' DHS payments to these hospitals for fiscal years 1997 through 2000 and recommended that CMS disallow $140,281,921 in FFP for Illinois' DSH payments to UIC Hospital and another $4,516,112 in FFP for Illinois' DSH payments to Mt. Sinai Hospital. *Id.* at ¶ 35; [12-5] at 61–62.

The OIG's recommendation stated:

> The excessive payments occurred because the State did not have effective procedures to ensure compliance with the hospital-specific limits or with State plan and State Administrative Code requirements. For example, the State did not use actual cost data from the prior year to calculate the DSH payment add-on for the next year. The State also did not compare Medicaid payments (including DSH payments) with actual Medicaid and charity care costs and did not adjust DSH payments as required by the State plan's retroactive adjustment provisions.

[12-5] at 61.

About two years later, in 2006, the OIG issued a summary report regarding Illinois and similar states that had used a prospective method to calculate DSH limits, further recommending that CMS seek recovery of excess FFP payments. [13] at ¶ 38; [12-5] at 106–29. The report stated, in pertinent part:

6

> Nine of the ten States reviewed did not comply with the hospital-specific DSH limits imposed by section 1923(g) of the Act. As a result, DSH payments exceeded the hospital specific limits by approximately $1.6 billion ($902 million Federal share). The $902 million Federal share included the following: Four States (California, Illinois, Texas, and Washington) made approximately $679 million in excess DSH payments based primarily on historical costs rather than actual costs. These States did not later adjust the payments using actual costs. . . . [T]he Illinois State plan required retroactive adjustments of estimated DSH payments to actual costs. . . .

[12-5] at 116. On December 21, 2005, the then-CMS administrator, in response to OIG's draft report and recommendations, wrote: "We interpret this recommendation as a prospective resolution and not a requirement to recoup any Federal payments associated with these findings." [12-5] at 127. CMS did not take any immediate action to recoup any federal payments.

### 3. 2016 Disallowances and Administrative Appeal

But over a decade later, on July 25, 2016, CMS wrote to Illinois, notifying the State that it would impose disallowances of $140,281,921 for UIC Hospital and $4,516,112 for Mt. Sinai Hospital and concurring with and adopting the OIG's 2004 findings. [13] at ¶ 40; [12-5] at 131–38. Illinois then requested reconsideration of both disallowances, but CMS denied the requests. [13] at ¶ 41; [12-2] at 36–39.

Illinois then timely appealed to the HHS' Departmental Appeals Board (Board), which consolidated the appeals of the two disallowances. [13] at ¶ 42. On April 2, 2018, in the consolidated appeal, the Board upheld CMS' disallowances. [13] at ¶ 43; [12-2] at 1–18. In its opinion, the Board summarized OIG's 2004 findings that Illinois "had prospectively calculated each hospital's DSH limit for the coming rate year by combining estimated Medicaid inpatient costs, estimated Medicaid

outpatient costs, and estimated uncompensated charity case costs." [12-2] at 5.  The Board also noted that the Illinois' rate year ran from October 1 through September 30, and that Illinois notified hospitals of their DSH amounts prior to the October 1 start of the coming rate year.  *Id.* at 4.

In its opinion, the Board never reached the question of whether Illinois' calculation of the hospital-specific DSH limits violated § 1923(g) of the Social Security Act.  [13] at ¶ 44; [12-2] at 1–18.  Instead, in affirming the disallowances, the Board held that "the process that Illinois used to calculate and apply the hospital-specific DSH limits during the audit period cannot reasonably be considered consistent with the methodology that Illinois established, and CMS approved, in the State plan." [12-2] at 8.  In reaching this conclusion, the Board considered the language of the State Plan: "If the wording is clear, then it will control.  If the language is subject to more than one possible interpretation, that is, if it is ambiguous, the Board will defer to the state's proposed interpretation if it is reasonable."  *Id.* at 9.

The Board found the DSH provision ambiguous.  *Id.* at 11.  But the Board then found Illinois' interpretation that it allowed a prospective method unreasonable: "Notwithstanding the ambiguities in the State plan language that are reflected in the parties' different interpretations, we find that Illinois' process for calculating each hospital's DSH limit during the audit period cannot reasonably be considered to have followed the methodology that Illinois established, and CMS approved, in the State plan."  *Id.* at 11.

Illinois timely sought reconsideration of the Board's decision. [13] at ¶ 47. But, on January 27, 2019, the Board sustained its original decision, concluding that Illinois failed to identify a clear error of law or fact. *Id.* at ¶ 49; [12-2] at 19–32.

After the Board issued its decision on Illinois' motion for reconsideration, CMS began recovering the disputed DSH payments at around $20 million per quarter, plus interest, by offsetting that amount against HHS' FFP in Illinois' ongoing Medicaid payments. [13] at ¶ 50.

Illinois filed suit in this Court, seeking review of the Board's decision. [1].

## II.    Standard of Review

The APA provides for judicial review of final agency decisions. *Cook County, Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); 5 U.S.C. §§ 702, 706. This case calls for this Court to review an agency decision interpreting a State Plan, which constitutes a contract between the state and federal government subject to federal Medicaid law. *See Iowa Dep't of Human Servs.*, DAB 1248 (H.H.S. May 3, 1991) (a "state plan is in the nature of a contract between the State and the federal government.") (quoting *Tennessee Dept. of Health and Environment*, DAB No. 950 (H.H.S. 1988)).

The majority of circuits have adopted the view that courts must review an agency's contract interpretation under the two-step framework set forth in *Chevron U.S.A., Incorporated v. Natural Resources Defense Council, Incorporated*, 467 U.S. 838 (1984) where, as here, the contract's subject matter concerns the agency's specialized expertise. *Sternberg v. Sec'y, Dep't Of Health And Human Servs.*, 299

F.3d 1201, 1205 (10th Cir. 2002); *Muratore v. U.S. Office of Pers. Mgmt.*, 222 F.3d 918, 922 (11th Cir. 2000); *Williams Nat. Gas Co. v. F.E.R.C.*, 3 F.3d 1544, 1549 (D.C. Cir. 1993) (explaining that *Chevron* "implicitly modified earlier cases that adhered to the traditional rule of withholding deference on questions of contract interpretation") (internal quotation omitted); *but see, e.g.*, *Meadow Green-Wildcat Corp. v. Hathaway*, 936 F.2d 601, 605 (1st Cir. 1991) (*Chevron* deference inapplicable to "the agency's interpretation of a contract that it makes with an outside party").[1]

*Chevron*'s two-step framework answers the "overriding question" of whether the agency's interpretation "is one the text will permit." *Wolf*, 962 F.3d at 221. At step one, this Court decides whether the disputed text has spoken directly to the precise question in issue. *Id.*; *Coyomani–Cielo v. Holder*, 758 F.3d 908, 912 (7th Cir. 2014). If it has done so unambiguously, the inquiry ends, and this Court gives full effect to the unambiguous text. *Holder*, 758 F.3d at 912. But if the text is ambiguous, this Court moves to step two, which asks "whether the agency has promulgated a reasonable interpretation." *Our Country Home Enterprises, Inc. v. Comm'r of Internal Revenue*, 855 F.3d 773, 785 (7th Cir. 2017) (quoting *Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013)). At this second step, this Court defers to the agency's interpretation only "if it is reasonable." *Indiana v. E.P.A.*, 796 F.3d 803, 811 (7th Cir. 2015); *Wolf*, 962 F.3d at 221.

---

[1] The Supreme Court has yet to resolve the circuit split on this point. In fact, Justice Gorsuch has observed that whether "*Chevron*-type deference warrants a place in the canons of contract interpretation is surely open to dispute." *Scenic Am., Inc. v. Dep't of Transp.*, 138 S. Ct. 2 (2017) (statement of Gorsuch, J., joined by Roberts, C.J., and Alito, J., respecting the denial of certiorari).

### III. Analysis

Illinois challenges the HHS Board's determination that Illinois' application of a prospective method to DSH payments is unreasonable under the language of the State Plan. [17]; [22]. This Court addresses a threshold legal issue before turning to the merits of the Board's decision.

### A. Waiver

HHS argues that Illinois has waived certain interpretive arguments it now raises because it did not raise them before the Board. [18] at 37–38. Courts recognize the "hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)); *see also Underwood v. Berryhill*, No. 18-CV-326-SLC, 2019 WL 1276091, at *5 (W.D. Wis. Mar. 20, 2019) ("The failure to raise an argument during the administrative proceedings means that the issue is waived on appeal."), *aff'd sub nom. Underwood v. Saul*, 805 F. App'x 403 (7th Cir. 2020).

HHS argues that Illinois has for the first time raised the arguments: (1) that the fifth sentence of the DSH provision is the operative clause; (2) that the first four sentences are temporally neutral; and (3) that the "retroactive adjustments" in the sixth sentence could reasonably be read to apply to rates, not payments. *Id.* But these interpretive arguments support Illinois' position that its State Plan permitted its use of a prospective methodology, and Illinois has maintained this position

throughout the administrative proceedings, including before the Board. *See* [12-2] at 13. While some aspects of Illinois' argument in this Court differ from their presentation before the Board, Illinois consistently presented the heart of its argument throughout the administrative appeal and in litigating before this Court: that its State Plan permits a prospective method. As such, based upon the record here, Illinois has not waived that issue, so this Court considers it on the merits.

### B.   *Chevron* Analysis

#### 1.   Step One

At *Chevron* step one, this Court begins with analyzing the disputed text and determining whether an ambiguity exists. *Wolf*, 962 F.3d at 222. Interpreting a federal government contract requires this Court to apply federal common law. *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000). Under federal common law, a contract is ambiguous if "it is susceptible to more than one reasonable interpretation." *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 634 (7th Cir. 2012) (quoting *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001)). In deciding whether a contract gives rise to multiple interpretations, courts interpret its language "in an ordinary and popular sense as would a person of average intelligence and experience." *Funeral Fin.*, 234 F.3d at 1018 (internal quotation marks omitted).

Applying these rules, this Court finds the relevant text ambiguous as to whether the State Plan demands a retrospective or prospective method of calculating DSH limits. The DSH provision states:

[1] In accordance with Public Law 103–66, adjustments to individual hospital's disproportionate share payments shall be made if the sum of Medicaid payments (inpatient, outpatient, and disproportionate share) made to a hospital exceed the costs of providing services to Medicaid clients and persons without insurance.

[2] The adjustment to hospitals will be computed by determining a hospital[']s cost of inpatient and outpatient services furnished to Medicaid patients, less the amount paid to the hospital for inpatient and outpatient services excluding DSH payments made under this State Plan.

[3] The cost of services provided to patients who have no health insurance or source of third-party payment less any payments made by these patients shall be determined and added to the Medicaid shortfall calculated above.

[4] The result shall be compared to the hospital[']s estimated DSH payments.

[5] If the estimated DSH payments exceed the DSH limit (Medicaid shortfall plus cost of uninsured) then [Illinois] will reduce the hospital[']s DSH rate per day so that their DSH payments will equal the DSH limit.

[6] If necessary, retroactive adjustments will be made.

[12-5] at 20.

The first four sentences generally describe the process by which Illinois calculates and implements DSH limits for each hospital. Illinois contends that these sentences are time-neutral in that they do not command either a prospective or a retrospective method, [22] at 13–14, and this Court agrees. The sentences describe, at a high level: (1) that Illinois will make "adjustments" to hospitals' DSH payments; and (2) how Illinois will compute these "adjustments." The text does not further clarify whether said "adjustments" refer to a reconciliation process by which Illinois settles up its interim payments with actual costs hospitals incurred (consistent with

a retrospective method), or whether they instead describe how Illinois projects DSH payments for the following year (consistent with a prospective method). Thus, while the first four sentences of the provision may reasonably be interpreted to require a retrospective calculation, they may just as reasonably be interpreted to require a prospective calculation. Offering no real analysis, HHS merely responds with the conclusory assertion—without any support or basis—that "costs" in the provision mean "actual costs" and not "projected costs." [18] at 40–41.

Next, the fifth sentence of the DSH provision reads: "If the estimated DSH payments exceed the DSH limit (Medicaid shortfall plus cost of uninsured) then the Department [Illinois] will reduce the hospital[']s DSH rate per day so that their DSH payments will equal the DSH limit." [12-5] at 20. Like the first four sentences of the provision, the plain language of the fifth—either alone or in combination with the first four—simply does not define a purely retrospective or a prospective method. On one hand, this sentence could refer to a process of reconciliation and *payment* adjustment for each hospital under a retrospective method. *See e.g.*, *Louisiana Dep't of Health & Hosps. v. U.S. Dep't of Health & Human Servs.*, 566 F. App'x 384, 387 (5th Cir. 2014) (under a retrospective method, interim payments are "reconciled to actual costs and final payment is made, aligning the payments with the actual costs."). But this fifth sentence could also refer equally to a DSH *rate* adjustment process for the year ahead, as consistent with a prospective method. The plain text remains susceptible to at least two alternate constructions, either of which this Court finds reasonable.

Finally, the sixth sentence—the "If Necessary" clause—provides: "If necessary, retroactive adjustments will be made." [12-5] at 20. One obvious interpretation of this clause—and the one HHS advocates—is that it refers again to the year-end reconciliation process described in the fifth sentence. *See* [18] at 43. But the clause does not say what type of "adjustments" will be made (such as whether the adjustment is to a "rate" or a "payment"), nor when an "adjustment" may be "necessary." Enter Illinois' interpretation:

> [T]he If Necessary Clause anticipated a *contingency* in which a hospital's DSH rate already being applied would be adjusted if necessary, as of the beginning of the rate year, to correspond to the DSH limit if a calculation error or the hospital's successful appeal of its DSH status of basic add-on rate required such an adjustment.

[22] at 4. Illinois explains in further detail that the contingency arises where

> a hospital successfully appeals the determination of its Medicaid inpatient utilization data or rate, not only leading to an increase in its DSH add-on rate after the beginning of the rate year, but also potentially triggering application of its hospital-specific DSH limit determined under a prospective method and requiring a retroactive adjustment of that add-on rate that takes account of the DSH limit's effect.

[17-1] at 44.

This Court agrees that the text could give rise to Illinois' interpretation, as it does not specify the type of "adjustments" that Illinois would make. This interpretation also makes sense when considering the settled principle that courts should not "interpret contracts in a manner that would render specific contractual language mere surplusage." *Cent. States, Se. & Sw. Areas Pension Fund v. Standard Elec. Co.*, 87 F. Supp. 3d 810, 816 (N.D. Ill. 2015) (quoting *Thompson v. Amoco Oil*

*Co.*, 903 F.2d 1118, 1121 (7th Cir. 1990)). That is, if the fifth sentence did actually command a retrospective calculation method, as HHS contends, then the "If Necessary" clause—the text of which provides for "retroactive adjustments"—becomes arguably duplicative (and thus superfluous) because it says and means the same thing. In other words, under HHS' construction, both the fifth sentence and the "If Necessary" clause describe a year-end reconciliation process and thus mandate a retrospective method. Such construction, while not necessarily incorrect, violates the canon of construction that courts, where possible, ought to avoid reading a provision as surplusage. Conversely, Illinois' interpretation avoids surplusage and gives proper effect to the provision as a whole; that is, reading the fifth sentence as prescribing a prospective method harmonizes with an interpretation of the "If Necessary" clause as a catchall that permits rate adjustments when a contingency gives rise to that need.

Further, absent some contextual indication to the contrary, this Court gives words their ordinary meaning. The word "retroactive" (in the "If Necessary" clause) means "extending in scope or effect to a prior time" or "made effective as of a date prior to . . . imposition." *Retroactive*, Merriam-Webster Online Dictionary (last visited July 16, 2020). Applying this ordinary definition of the word "retroactive" comports with Illinois' understanding of the clause as providing for a contingency that would require a rate change, such as a hospital's successful appeal. [17-1] at 42, 44.

In sum, the DSH provision gives rise to two different meanings: one requiring Illinois to utilize a prospective method, and the other requiring Illinois to use a

retrospective method.  This Court thus finds the provision ambiguous as a matter of law.

### 2.    Step Two

Because this Court finds the provision ambiguous as to whether it supports a prospective or retrospective method of calculation, it moves to step two of the *Chevron* analysis.  At step two, this Court considers "whether the agency's answer is based on a permissible construction" of the contract.  *Wolf*, 962 F.3d at 226 (quoting *Chevron*, 467 U.S. at 843).  This Court finds that it is not and thus that the Board's opinion is not entitled to deference.

The Board properly recognized that the DSH provision is ambiguous yet concluded that it could not defer to Illinois' interpretation because it was "unreasonable." [12-2] at 1, 11.  The Board's analysis focused primarily upon the "If Necessary" clause, determining that the clause "referred to the computation described in the immediately-preceding sentences."  *Id.* at 14.  In rejecting Illinois' position that the clause's reference to "retroactive adjustments" means adjustments made after hospital appeals, the Board reasoned that "no mention of the hospital appeal process appears in the text of the hospital-specific DSH limit provision," that "the criteria for calculating each hospital's DSH add-on amount were set out in a different section of the State plan . . . and the appeal process for a hospital to request review of its DSH add-on amount appears to have been established and described in an entirely different chapter of the State plan."  *Id.* at 13.

The Board's reasoning is flawed. First, as discussed above, construing the clause's reference to "retroactive adjustments" to mean reconciliation of DSH payments to actual costs (under a retrospective method) renders the clause superfluous to the immediately preceding fifth sentence, which—under the Board's logic—says the exact same thing. *Standard Elec. Co.*, 87 F. Supp. 3d at 816 (courts should avoid interpretations that render any part of a contract mere surplusage). In contrast, Illinois' construction avoids rendering any part of the DSH provision redundant.

Second, the Board relied heavily upon its observation that the State Plan's provision on the hospital appeals process exists in a different chapter (Chapter IX) than the DSH provision. [12-2] at 13–14. But the State Plan—two sub-paragraphs before the DSH provision—also explicitly references hospital appeals of their DSH payment "ineligibility" or "payment amounts" pursuant to the appeals process more fully set out in Chapter IX. *See* [12-5] at 19–20. Thus, no clear separation actually exists between the State Plan's provisions on DSH limits and hospital appeals. Regardless, the Board offered no justification for its view that paragraphs of the State Plan must be self-contained. This Court thus finds the Board's analysis unreasonable on this point as well.

Finally, the Board agreed with CMS' argument that the phrase "estimated DSH payments" in the fifth sentence of the DSH provision means "interim" DSH payments because the word "estimated" only qualifies "DSH payments" and not other elements of the DSH limit, such as component costs. [12-2] at 14. Critically, however,

the Board failed to acknowledge that the fifth sentence mentions "DSH payments" twice but uses the word "estimated" to qualify just one of those instances: "If the *estimated DSH payments* exceed the DSH limit . . . then the Department will reduce the hospital[']s DSH rate per day so that their *DSH payments* will equal the DSH limit." [12-5] at 20 (emphasis added). Under a plausible reading of this phrasing, "estimated" only qualifies the first instance because it identifies projected DSH payments a hospital receives *before* a DSH-limit rate adjustment.

In sum, the Board held that it could not defer to Illinois' interpretation of the State Plan, finding unreasonable Illinois' view that the State Plan allowed for a prospective method. But as discussed above, this Court finds that the State Plan is susceptible to more than one reasonable interpretation and that the Board's conclusion otherwise conflicts with the plain text. This Court thus declines to defer to the Board under *Chevron* and instead reverses and remands this matter to the agency for further proceedings.

## IV.    Conclusion

For the reasons set forth above, this Court grants Illinois' motion for summary judgment [17] and denies HHS' motion for summary judgment [18].  The Board's decision upholding the disallowances is hereby vacated and the matter is remanded to the agency for further proceedings consistent with this opinion.  Civil case terminated.

Dated: September 25, 2020

Entered:

John Robert Blakey
United States District Judge